# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMBER CANTER, | |
| Plaintiff, | |
| v. | Civil Action No.:  ELH-22-2267 |
| THE STATE OF MARYLAND,<br>DPSCS SECRETARY ROBERT L. GREEN,<br>WARDEN CARLOS BIVENS,<br>SECURITY CHIEF BILL WISE,<br>LT. ERIC PARSONS,<br>CAPTAIN DONALD NEWLIN,<br>SERGEANT C. HAYS, | |
| Defendants. | |

## MEMORANDUM OPINION

The self-represented plaintiff, Amber Canter, filed a civil rights action pursuant to 42 U.S.C. § 1983.  Canter, a transgender inmate, alleges, *inter alia*, retaliation and harassment in connection with various complaints that she made during her incarceration at Roxbury Correctional Institution ("RCI").[1]

Canter has sued a host of defendants: the State of Maryland; Robert L. Green, Secretary of the Department of Public Safety and Correctional Services ("DPSCS); RCI Warden Carlos Bivens; RCI Security Chief Bill Wise; Lt. Eric Parsons; Captain Donald Newlin; and Sergeant C. Hays. ECF 1.  The individual defendants were sued in their individual and official capacities.  And, the suit includes multiple exhibits.  *See* ECF 1-1; ECF 2; ECF 2-1.

The Complaint contains five counts.  Count I alleges "14th Amendment violations" against the individual officer defendants.  ECF 1 at 17-18, ¶¶ 59-63.  The text of Count I also references

---

[1] Canter has since been moved to Patuxent Institution.  *See* ECF 23.

the Eighth and First Amendments to the Constitution.  *Id.* ¶¶ 60, 61.  Counts II and III are presented together and assert conspiracy claims against the correctional defendants under 42 U.S.C. § 1985.  ECF 1 at 18, ¶¶ 64-68.  Count IV asserts "Negligence" against the State of Maryland.  *Id.* at 19-20, ¶¶ 69-75.  And Count V is lodged against all defendants, asserting cruel and unusual punishment under Articles 16 and 26 of the Maryland Declaration of Rights.  *Id.* at 20-21, ¶¶ 76-83.[2]

In the Complaint, Canter asserts both "negligent conduct" and "deliberate indifference" by defendants.  *Id.* ¶ 2.  In a liberal reading of her suit, she complains that she was unlawfully placed in disciplinary segregation, without "the opportunity to have a investigation [sic]," *id.* ¶ 4, into the "fabricated" accusation of Lt. Parsons, *id.* ¶ 3, who claimed falsely that plaintiff "threatened his life . . . ."  *Id.* ¶ 4.  And, she asserts that she was denied due process of law, in violation of the Fourteenth Amendment; she was subjected to cruel and unusual punishment, in violation of the Eighth Amendment; her First Amendment rights were violated through retaliatory conduct by defendants, because of her civil rights actions; and defendants conspired to interfere with her civil rights, in violation of 42 U.S.C. § 1985.  Further, she asserts in the text of her suit that her rights were violated under the "Americans With Disabilitys Act" [sic].  ECF 1, ¶ 6.  But, the assertion is not the subject of a count.

Among other things, Canter also asserts that defendants Green, Bivens, Wise, Newlin, and Hays conspired to interfere with her civil rights when they saw that Parsons wrote a false document charging Canter with rule violations but did nothing to intervene on Canter's behalf or to ensure that the conduct did not take place again.  *Id*. at 18, ¶ 65.  Canter also alleges that defendants Green,

---

[2] Article 26 concerns search warrants, and appears inapplicable here.  *See* ECF 17-1 at 11 n.4.

Bivens, Wise, Newlin, and Hays conspired with Parsons to impose unlawful corporal punishment and harassment on her, in violation of her Eighth Amendment rights. ECF 1, ¶ 66. And, she claims that defendants Bivens, Wise, and Newlin failed to intervene on her behalf when defendants Hays and Parsons committed retaliatory acts against her, in violation of her rights under the Eighth and Fourteenth Amendments to the Constitution. *Id*. ¶ 67. Canter also raises pendent State claims of negligence and State constitutional violations. *Id*. at 19-21.

For relief, Canter seeks monetary damages, ECF 1 at 18, 21, as well as injunctive relief. *Id.* at 21. Specifically, she seeks an order requiring defendants to cease all retaliation against her and accept her grievances. *Id.* She also seeks an investigator "so she can file criminal charges on Defendant Parsons" for fabricating a false document against her. *Id*.

Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 17. The motion is supported by a Memorandum (ECF 17-1) (collectively, the "Motion") and an exhibit. ECF 17-2. Canter opposes the Motion. ECF 21. She also submitted a memorandum (ECF 21-1) as well as an exhibit (ECF 21-3) that was previously submitted by defendants as ECF 17-2. Defendants filed a reply. ECF 22.

No hearing is needed to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, I shall construe the Motion as a motion to dismiss and I shall grant it.

## I.     Factual Background

Canter is a transgender inmate confined at all relevant times at Roxbury Correctional Institution. She alleges that on June 30, 2022, Lt. Eric Parsons came to her cell door, harassed her, and retaliated against her for "filings" that she made in federal court. ECF 1 at 3, ¶ 3. She also avers that he "fabricated a state document in order to place [her] on Disciplinary Segregation." *Id.* ¶ 25. Specifically, Canter states that Parsons served her with a notice of inmate rule violations for

engaging in a disruptive act, making threats to do bodily harm to him, and disobeying an order. *Id*. at 8-9, ¶ 25.

According to Canter, that the conversation that was the impetus behind the infraction began with Lt. Parsons telling her that her cellmate, Paul Dickens, was being moved to general population. *Id*. at 9, ¶ 25.[3] Canter informed Lt. Parsons that Dickens had provided a statement to Lt. Carter notifying the administration that "his life was in extreme danger to go out on the compound . . . ." *Id*. Further, she informed Lt. Parsons that she was waiting for Warden Bivens "to set up a safe housing situation" for her before she would return to general population. *Id*. Canter warned Lt. Parsons that she was "already preparing a civil action with the federal courts" and that she was going to have her attorneys call the Attorney General's office to "address these unconstitutional actions that are being done" to retaliate against Canter because of "the correctional officer being found guilty in criminal court." *Id*.

Plaintiff recalls that Lt. Parsons told her he knew about her civil cases but did not care about them, and that Canter and Dickens would be "'split up.'" ECF 1 at 9, ¶ 26. At that time, Canter told Lt. Parsons that this change would allow correctional staff to put anyone in the cell with Canter, who could do bodily harm to her, and therefore she was "refus[ing] housing" because she did not want her life to be placed in danger. *Id*. When Lt. Parsons explained to Canter that she was not being removed from administrative segregation, only Dickens was being removed, and that Canter could not refuse housing under this circumstance, Canter insisted: "I am allowed to refuse housing at any time that I please . . . ." *Id*. ¶ 27. Canter added that refusing housing was her "right as a inmate." *Id*.

_____

[3] At the time, plaintiff was in protective custody. ECF 17-2 (Decl. of Todd Hull, RCI Assistant Warden), ¶ 3.

Canter asked to speak with a Captain as she was "frustrated" talking to Lt. Parsons. ECF 1 at 9, ¶ 28. Canter's request was denied. *Id*.

Dickens attempted to intervene by telling Canter that he would "deal" with the matter. ECF 1 at 9, ¶ 29. Dickens then explained to Lt. Parsons that he was "not gonna allow" anyone to put him or Canter in general population because their lives would be in jeopardy. *Id*. at 9-10, ¶ 29. Dickens reminded Lt. Parsons that Canter had testified against a correctional officer who was a high-ranking member of a gang. *Id*.

Canter recounts that Dickens warned Lt. Parsons that if Dickens was forced to return to general population and something happens to him, or they place someone in the cell with Canter, who causes her harm, Lt. Parsons would be liable for "deliberate indifference." *Id*. When Lt. Parsons said he would see what he could do to help Dickens, Dickens handed Lt. Parsons paperwork that had been submitted previously to Lt. Brian Carter. *Id*. After reviewing the paperwork, Canter recalls that Lt. Parsons claimed to have no knowledge of the facts described in the inmate statements and that he was going to place Dickens in administrative segregation for 30 days while he investigated the matters alleged in the documents. *Id*. Lt. Parsons then left to take a phone call. *Id*. at ¶ 30.

Approximately five minutes after Lt. Parsons left, Sgt. Pendergast came to Canter's cell door and told Canter to pack her property because Lt. Parsons said Canter and Dickens had to be put on disciplinary segregation. ECF 1 at 10, ¶ 31. Sgt. Pendergast told Canter that all he knew was that Canter and Dickens were being locked up for refusing housing and speculated that they would "be off in two or three days." *Id*.

Canter was placed in a strip cell on disciplinary segregation, where she did not have access to her personal property or her medication.  ECF 1 at 11, ¶ 32.  She was served with a notice of inmate rule violation written by Lt. Parsons that states, ECF 2 at 1, *id.*  ECF 1 at 11, ¶ 33:

> On 6/30/22 at 8:00 A.M. I Lt. E Parsons was conducting security rounds in Housing Unit 5 when Sgt. S. Pendergast informed me cell 5-B-16 needed to speak with me.  I proceeded to cell 5-B-16 which housed Inmates Canter, Amber (2979873 5-B-16A) and Dickens, Paul (2325111 5-B-16B).  I made initial contact with Inmate Canter who told me that Inmate Dickens wasn't moving unless they stayed together.  I informed Canter that Dickens was the only one being released to the compound.  Inmate Canter then informed me that a lawsuit had already been filed and their attorneys had been informed that they were heading to North Branch today because the only move they were making was together or they were gonna force us to transfer them to North Branch by any mean [sic] necessary.  I then asked Inmate Canter what was meant by this statement.  Inmate Canter told me "that violence would be used and a cell extraction would cost the officer's [sic] dearly if they tried."  I asked Canter if he was threatening me and the Inmate replied "its [sic] a promise."  I then put a stop to all movement within Housing Unit 5 as to prepare the officer's [sic] for a possible cell extraction.  For the next 30 minutes I tried to convince Inmates Canter and Dickens that this was not the best way to do this and I didn't want to use force but would if I had to.  Inmate Canter told me again "do what you have to do cause we ain't moving unless its together and I am ready for you if you try to come in the cell."  I then ordered Canter to pack up to which he refused saying "Again I am only moving if i [sic] stay with my current cell mate."  I then called operations and after further discussion I was told to place both occupants in 5-B-16 into a segregation cell together pending adjustment.

Plaintiff was charged with a violation of Rule 100 (engaging in a disruptive act); Rule 104 (making threats that include using physical harm to objects, property, or individuals), and Rule 316 (disobeying an order). ECF 2 at 1.  She alleges that the notice of rule violation was "approved by Defendant Captain Donald Newlin without any type of investigation into these severe charges that could result in a liberty interest being removed from [her] over these fabricated facts."  ECF 1 at 11, ¶ 34.

Additionally, Canter claims that she was entitled to have Lt. Parsons's charges against her investigated by Captain Newlin before she was put into disciplinary segregation.  *Id.* at 12, ¶ 36.

Moreover, she maintains that the failure to do so was a violation of her Fourteenth Amendment rights. *Id.* Specifically, Canter believes Captain Newlin should have obtained her side of the story before she was moved to segregation. *Id.*

Dickens, who was Canter's cellmate, also received a notice of inmate rule violation written by Lt. Parsons. ECF 2-1 at 9. Dickens was charged with violating Rule 316, disobeying an order, based on the alleged facts, as follows, *id.*:

> On 6/30/22 I Lt. E Parsons was assigned security rounds for Housing Unit 5. While conducting my rounds i [sic] was informed by Sgt. S. Pendergast that 5-B-16 needed to speak with me. I walked to cell 5-B-16 which housed inmates Dickens, Paul (2325111 5-B-16B) and Canter, Amber (2979873 5-B-16A). I informed Dickens he was being sent to the compound as he was being released from Administrative Segregation. Inmate Dickens informed he wasn't safe on the compound and wouldn't be moving. I advised Dickens that if he didn't move he would receive an adjustment and move to Housing unit 5 C tier. I then ordered Dickens to pack his property and move to the compound to which he refused. I then informed Dickens he would be receiving an adjustment to pack up his property and move to C tier to which he complied.

Canter claims she asked for grievance forms from correctional officers on June 30, 2022, and again on July 1, 3, 6, 7, and 12 of 2022. ECF 1 at 12, ¶ 38. But, she asserts that she was denied the forms. *Id.*

On July 13, 2022, Canter was interviewed by Acting Security Chief Bill Wise. *Id.* Canter recalls that Wise asked her if she would mind going into protective custody if she was not allowed to return to general population. *Id.* When Canter confirmed that she did not mind going onto protective custody, Wise said he would talk to Warden Bivens about it on the following Monday. *Id.* Canter then told Wise that Lt. Parsons had "fabricated facts" on the Notice of Inmate Rule Violation to "retaliate" against her "for all the issues that [her] attorneys have called up" regarding the manner in which correctional officers at RCI conduct themselves. *Id.*

Canter also told Wise that it was her cellmate who made threats against Lt. Parsons, and that he did so because he believed that his life was about to be placed in danger by being moved to general population. *Id*. at 13. Although Wise told Canter he would look into the matter and get back to her by July 18, 2022, Canter states that he never returned, nor did he investigate her claims. *Id*.

Plaintiff states that on July 13, 2022, she "handed" Wise an Administrative Remedy Procedue ("ARP") form. ECF 1 at 13, ¶ 39. She alleges that she "had to buy off the tier from an inmate" due to being denied forms, so that she could file a grievance as to Lt. Parsons. *Id.*

Canter sent a letter to the Secretary of the DPSCS on July 15, 2022, requesting an investigation of her claims against Lt. Parsons and others by the Internal Investigations Division ("IID"). ECF 1 at 13, ¶ 40. In her letter, Canter explained that officers at RCI were misusing Inmate Rule Violations to retaliate against her for her civil lawsuits. *Id*. She also claimed that supervisors were refusing to investigate the issues she brought up, such as the issue she tried to raise regarding Parsons. *Id*. Canter states she did not receive a response from the Secretary, but the Warden sent her a message through her case manager that she would "have to wait" until she had her adjustment hearing. *Id*.

On July 16, 2022, Canter obtained another ARP form from another inmate because "the defendants were refusing to provide [her] with ARP form[s]." ECF 1 at 13, ¶ 41. She used the form to file a complaint against Parsons, but never received a response due to Sgt. Hays's failure to process the complaint. *Id*. She states that she appealed the non-response to the Inmate Grievance Office ("IGO"), "along with adjustment issues as policies mandate . . . [that] a.r.p.s. [sic] cannot be filed on a[n] action that is to be investigated by the IID division for the DPSCS."

8

*Id.* Canter adds that she filed a tort claim with the Maryland State Treasurer and asserts that she has "met all the requirements in the PLRA." *Id.*

Canter spoke with Acting Security Chief Emanual on July 21, 2022, about "a grievance that [she] gave to Defendant Wise" on July 13, 2022. ECF 1 at 13, ¶ 42. Emanual called Wise, who told Emanual that Canter would "not be getting that grievance back" and if Canter did not like that, she could "call [her] lawyers." *Id.*

Also on July 21, 2022, plaintiff spoke with Institutional Representative Yutzy. ECF 1 at 14, ¶ 42.[4] Yutzy came to Canter's cell to tell her that they were still waiting for the "security video footage from the date and time in question for [her] adjustment" and that after it is received, Canter would receive an adjustment hearing regarding the charges of June 30, 2022. *Id.* Yutzy offered Canter a plea deal wherein Canter would plead guilty to the violations charged and receive 60 days of segregation and 90 days loss of good conduct credit in exchange for her guilty plea. *Id.* Canter rejected the offer. *Id.*

Canter recalls that Yutzy then explained that Canter should realize that they were "going to wait and get an adjustment officer that will find [her] guilty" because she made "threats of harm to a officer [sic] and a High ranking supervisor . . . ." *Id.* Canter denied making any threats and Yutzy left. *Id.* At this point, Canter claims she had been on segregation awaiting an adjustment hearing for over 22 days, "without due process." *Id.*

When Sgt. Hays came to Canter's cell to ask for her signature on ARP responses from the Warden regarding complaints unrelated to this case, Hays allegedly said: "'Canter when are you just gonna give up and be like other inmates do [your] time . . . .'" ECF 1 at 14, ¶ 43. Hays then

---

[4] The Complaint contains two paragraphs that are labeled as number 42. This portion is found in the second of the two paragraphs.

told Canter that any complaints Canter files will be dismissed, that no staff member will ever get in trouble based on what Canter says, and that Hays told staff not to give Canter any more grievance forms. *Id.* In addition, Canter claims that Hays said, *id.*:

> "[Y ]our [sic] not gonna flood my office with your nonsense you have these big shot lawyers call them and have them do more crying for you o[h] wait you can't call them do you see how it works [C]anter you are in our house and we control your life Lt. Parsons has already showed you how easy it is to confine you and cut you off from all avenue [sic] to cause us havic [sic] with your frivolous complaints this is prison if you do not like how we treat you then keep your dumb ass home."

On July 27, 2022, Canter received an "unconstitutional adjustment" hearing before Hearing Officer Dustin Fignar. ECF 1 at 14, ¶ 44. Canter states that she provided about four hours of testimony, which included her own testimony as well as testimony of correctional officers whom she called as witnesses. *Id.*

According to Canter, the correctional officers testifying on her behalf stated that Lt. Parsons had lied and had no knowledge of what Lt. Parsons was talking about. *Id.* Canter also called Dickens as a witness and he testified that he was the one who made threats to harm Lt. Parsons, not Canter. *Id.*

Hearing Officer Fignar found Canter not guilty of a violation of Rule 100 (engaging in a disruptive act) and Rule 104 (making threats that include using physical harm to objects, property, or individuals), but guilty of a violation of Rule 316 (disobeying an order), which Canter had admitted. *Id.* at 14-15, ¶ 44. Canter then asked Fignar if the transcript of the hearing could be forwarded to the Maryland State Police IID so that she could file criminal charges against Lt. Parsons for fabricating state documents and lying under oath. *Id.* at 15, ¶ 44. Fignar advised that Canter would have to contact someone at the prison for assistance. *Id.*

After Canter's adjustment hearing, she was removed from disciplinary segregation and placed on administrative segregation pending assignment to protective custody. ECF 1 at 15, ¶ 45. On August 3, 2022, Canter was "transferred to central Protective Custody" at RCI. *Id.*

On August 8, 2022, Acting Chief of Security Emanual told Canter that Warden Bivens sent him to inform Canter that IID would not be contacted on Canter's behalf. *Id.* ¶ 46. In addition, Canter was informed that if she wanted to press charges or launch an investigation, she would have to do it on her own. *Id.* Emanual suggested that Canter should call her attorneys. *Id.*

Plaintiff contends that, as a result of the experiences she related, defendants "exacerbated her already existin [sic] conditions of depression, bi-polar disorder, and severe post-traumatic stress disorder . . . ." *Id.* ¶ 6.

Additional facts are included in the Discussion.

## II.    Standard of Review

Defendants styled their Motion as a motion to dismiss or, in the alternative, for summary judgment. In support of the Motion, they submitted the Declaration of RCI Assistant Warden Todd Hull concerning Canter's housing assignment.[5]

A defendant may test the legal sufficiency of a plaintiff's complaint by way of a motion to dismiss under Rule 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon

---

[5] Hull is not named as a defendant.

11

which relief can be granted." *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317-18 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle

only applies … if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).[6]

---

[6] "[B]efore treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Because plaintiff is self-represented, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord. Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

---

Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

## III.    Section 1983

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377 (2012); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is

16

identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

An individual cannot be held liable in a § 1983 action under a theory of respondeat superior. *Iqbal,* 556 U.S. at 676. The Supreme Court has explained, *id.*: "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See also Younger v. Crowder*, ___ F.4th ___, 2023 WL 5438173, at *6 n.12 (4th Cir. Aug. 24, 2023); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Thus, § 1983 requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same). If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge*, 550 F.2d at 928.

To be sure, a supervisor may be liable "for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013); *see Love-Lane v.*

*Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (recognizing that there is no respondeat superior liability under § 1983).   However, liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"   *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020).

Thus, supervisory liability under § 1983 must be predicated on facts that, if proven, would establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

To qualify as "pervasive," a plaintiff must demonstrate that the challenged conduct "is widespread, or at least has been used on several different occasions."  *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . . Nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct."  *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration added in *Slakan*).

However, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate

indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799; *see also Younger*, 2023 WL 5438173. But, "a supervisor's mere knowledge" that his subordinates have engaged in unconstitutional conduct is insufficient to give rise to liability; instead, a supervisor is only liable for "his or her own misconduct." *Iqbal*, 556 U.S. at 677.

Therefore, "to state a claim for supervisory liability, 'a plaintiff must plead that *each* [supervisory] defendant, through the official's *own individual actions,* has violated the Constitution.'" *Evans v. Chalmers*, 703 F.3d 636, 660–61 (4th Cir. 2012) (Wilkinson, J., concurring) (emphasis and alteration in *Evans*) (quoting *Iqbal*, 556 U.S. at 676). If a plaintiff makes "bare assertions" that amount to "nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," the claim is insufficient. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 554–55); *see Langford v. Joyner*, 64 F.4th 122, 125-26 (4th Cir. 2023).

Of relevance here, "not all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (1995) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). A constitutional violation requires more than mere negligence. *See Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Indeed, "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000).

## IV.   Discussion

Defendants argue that dismissal of the Complaint is warranted under Rule 12(b)(6) because the Complaint fails to include facts that, if proven, would establish deliberate indifference, as required to support a claim under the Eighth or Fourteenth Amendments to the Constitution; the supervisory liability claims fail where, as here, the allegations are conclusory; the Complaint

establishes that Canter received procedural due process in connection with the infraction issued by Parsons; no causal connection has been alleged between defendants' actions and Canter's prior judicial activism; the State of Maryland is entitled to Eleventh Amendment immunity; the conspiracy claim has no factual basis; and Canter is not entitled to injunctive relief.  ECF 17. Canter's opposition is essentially a restatement of her Complaint.  *See* ECF 21.

### A.   Supervisory Liability

Canter's claims against Bivens, Wise, and Newlin are based on their roles as supervisors. ECF 1 at 18, ¶ 67.  As noted earlier, the doctrine of respondeat superior does not apply as to § 1983 claims.  *See Love-Lane*, 355 F.3d at 782.  Moreover, as discussed, a defendant's liability requires a showing of personal fault, based on the defendant's own conduct.  *Iqbal*, 556 U.S. at 676-77; *Younger*, 2023 WL 5438173, at *6; *Vinnedge*, 550 F.2d at 928.

Canter alleges no constitutional injury traceable to the conduct of these three defendants or to their tacit authorization of an alleged offensive practice.  The disciplinary charge against Canter required a determination of witness credibility, addressed through an evidentiary hearing.

In sum, plaintiff "has the burden of pleading a facially plausible claim" as to Bivens, Wise, and Newlin.  *Langford*, 62 F.4th at 125.  She has failed to do so.

### B. Sovereign Immunity

#### 1.

The Eleventh Amendment to the Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The

ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court.").

The Supreme Court has explained: "Although by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suit for damages by citizens against their own States." *Garrett*, 531 U.S. at 363 (collecting cases); *see Allen v. Cooper*, ___ U.S. ___, 140 S. Ct. 994, 1000 (2020); *see, e.g.*, *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000); *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, __ U.S.__, 140 S. Ct. 903 (2020); *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012). In *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019), the Court said: "The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" (quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)).

However, the Eleventh Amendment did not create State sovereign immunity. Indeed, "the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see Sossamon v. Texas*, 563 U.S. 277, 284 (2011). Thus, the Fourth Circuit has recognized that State sovereign immunity is "'broader'" than Eleventh Amendment immunity. *Williams v. Morgan State Univ.*, 2022 WL 7375983, at *1 (4th Cir. Oct. 19, 2022) ("*Williams II*") (quoting *Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam) ("*Williams I*")).

Nevertheless, the principles of Eleventh Amendment immunity and State sovereign immunity are often blended and addressed collectively.  In *Whole Woman's Health v. Jackson*, __ U.S.__, 142 S. Ct. 522, 532 (2021), the Supreme Court stated: "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity."  And, in *Williams I*, 850 F. App'x at 174, the Fourth Circuit recognized that "courts often discuss both doctrines under the banner of Eleventh Amendment immunity . . . ."

The preeminent purpose of State sovereign immunity is to "accord states the dignity that is consistent with their status as sovereign entities."  *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).  The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'"  *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system").  Thus, in the absence of waiver or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890).

Immunity under the Eleventh Amendment bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state."  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of the*

*Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2015); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005). Put another way, immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195–96 (4th Cir. 2016) (quoting *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).

Moreover, the Supreme Court said in *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted): "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *See also Pennhurst*, 465 U.S. at 101–02 ("And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."); *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.").

Thus, Eleventh Amendment immunity protects "State officials acting in their official capacities from being sued in federal court without their consent." *Murphy v. Commonwealth of Va.*, 2022 WL 17484286, at *1 (4th Cir. Dec. 7, 2022) (per curiam); *see Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). But, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). Moreover, personal capacity suits, which seek to impose

individual liability on a government official for an action taken under color of State law, are also not barred by the Eleventh Amendment.  *Murphy*, 2022 WL 17484286, at *2.

On the other hand, Eleventh Amendment immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by & through Ram Ditta v. Md. Nat'l Cap. Park & Plan. Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979)).  And, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto*, 773 F.3d at 543); *see DiCocco v. Garland*, 18 F.4th 406, 414 (4th Cir. 2021).

"A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense." *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012); *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *see also Quern v. Jordan*, 440 U.S. 332, 345 (1979) ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"); *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018), *aff'd*, ___ U.S. ___, 140 S. Ct. 994 (2020).

However, "[t]he Eleventh Amendment bar to suit is not absolute."  *Feeney*, 495 U.S. at 304.  The Fourth Circuit outlined exceptions to Eleventh Amendment immunity in *Lee-Thomas*, 666 F.3d 244 at 249 (internal quotations omitted), stating:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of

24

constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

In addition, "[a] State remains free to waive its Eleventh Amendment immunity from suit in federal court." *Lapides*, 535 U.S. at 618. Notably, a State may do so by statute. *Pense*, 926 F.3d at 100 (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996)); *see Lapides*, 535 U.S. at 618; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp.*, 473 U.S. at 240; *see Pense*, 926 F.3d at 101.

A "general waiver" is not sufficient to waive Eleventh Amendment immunity. *Pense*, 926 F.3d at 101. Under *Atascadero State Hosp.*, 473 U.S. at 254, a court may find that a state has waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250–51. In other words, the waiver must be both clear and express. *Feeney*, 495 U.S. at 305; *see Atascadero State Hosp.*, 473 U.S. at 241. Notably, "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *Coll. Sav. Bank v. Fla. Prepaid Post Secondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999); *see Pense*, 926 F.3d at 101.

### 2.

Canter asserts claims against the individual defendants in their official capacity. ECF 1 at 1-2. Claims for money damages filed against state employees acting in their official capacities are subject to Eleventh Amendment immunity, because a suit against a state actor in his official

capacity is tantamount to a suit against the state itself. *Holt*, 469 U.S. at 471-72; *see also Hafer v. Melo*, 502 U.S. 21, 26 (1991); *Will*, 491 U.S. at 71.

Moreover, under the Eleventh Amendment, a state, its agencies, and departments are also immune from citizen suits in federal court, absent state consent or congressional action. *See Pennhurst,* 465 U.S. at 100. Although the State of Maryland has waived sovereign immunity for certain types of cases brought in state courts, *see* Md. Code, State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court for claims brought pursuant to § 1983. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst*, 465 U.S. at 100 (emphasis in original).

Therefore, based on the principles of sovereign immunity, outlined earlier, plaintiff's federal constitutional claims for money damages, lodged against the State of Maryland and the DPSCS, as an arm of the State, are also subject to dismissal. But, to the extent that Canter asserts any State tort or State constitutional claims against the State defendants, the dismissal shall be without prejudice.

However, a different analysis applies to claims raised under Title II of the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"). Congress has abrogated sovereign immunity for the states as to Title II, where the conduct that allegedly violates the ADA is also alleged to violate the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 158-59 (2006); *see Tennessee v. Lane*, 541 U.S. 509, 530 (2004); *Brown v. Dep't of Public Safety and Corr. Services*, 383 F. Supp. 3d 519, 552-53 (D. Md. 2019). In *Georgia*, the Court said, 546 U.S. at 159 (emphasis in *Georgia*): "[I]nsofar as Title II creates a private cause of action for damages

against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."

A three-prong test applies "on a claim-by-claim basis", as follows: "(1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*

### C.    Disciplinary Proceedings

The basis of Canter's constitutional claims under the Eighth and Fourteenth Amendments arise out of the Notice of Inmate Rule Violation issued by Lt. Parsons. Even assuming that the Notice was based on falsehoods, as Canter alleges, the Complaint fails to state a claim.

To be sure, Canter is entitled to certain procedural due process protections in connection with a prison disciplinary proceeding. But, her insistence that she was entitled to an investigation concerning the veracity of the report upon which it was based, before the Notice was issued, is wide of the mark. She had no such constitutionally protected right. Therefore, the claim is not properly before this court.

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)). In prison disciplinary proceedings, where an inmate faces the possible loss of diminution credits, the prisoner is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is

afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff*, 418 U.S. at 564-66, 592.

Canter received notice of the charges against her. She asserts that, at the hearing, she was permitted to call multiple witnesses to testify and to present evidence. And, she acknowledges that she was successful in regard to the more serious rule violations against her, which were dismissed. The only rule she was found to have violated is the rule she admits to having violated: disobeying an order.

Moreover, where a prisoner brings a § 1983 suit claiming, as Canter does here, that prison officials fabricated charges in order to cause her to lose good conduct credits and lengthen her sentence, the claim is improperly raised in a § 1983 complaint for damages. *See Moskos v. Hardee*, 24 F.4th 289, 294 (4th Cir. 2022). Such a complaint "must be dismissed unless the plaintiff can demonstrate that the conviction or sentence already has been invalidated." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). "[T]his rule applies not merely to substantive challenges to convictions, but also to those challenges to internal prison procedures that would be 'such as necessarily to imply the invalidity of the judgment.'" *Moskos*, 24 F.4th at 295 (quoting *Edwards v. Balisok*, 520 U.S. 641, 645 (1997)).

To the extent that Canter's due process claim requires this court to determine whether Lt. Parsons' allegations were true, the claim cannot be raised in the context of a § 1983 suit.

### D.      Conditions Claim

Canter challenges the conditions of her confinement pending her adjustment hearing.

For a prison official to be found liable under the Eighth Amendment for denial of humane

conditions of confinement, "the official [must know] of and disregard[] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997).  A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established.  *Farmer*, 511 U.S. at 834, 837.

An Eighth Amendment claim regarding conditions of confinement requires proof of "two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'"  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted); *see Farmer*, 511 U.S. at 834; *Younger*, 2023 WL 5438173, at *6; *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021). In the context of an Eighth Amendment conditions of confinement claim, a prisoner must either "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," or "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions."  *Shakka,* 71 F. 3d at 166.

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment under the Eighth Amendment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.

Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)); *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005)).   Whether confinement conditions are atypical and

substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)).

For Due Process protections to apply, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions."  *Prieto v. Clarke*, 780 F.3d 245, 250 (4th Cir. 2015) (emphasis in original) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005)).  But, "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection."  *Prieto*, 780 F.3d at 250.

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence."  *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015).  Where, as in *Bevarati*, 120 F.3d 500, conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment.  *Id.* at 503.  Setting aside the semantics of Canter's housing assignment,[7] her movement to a different cell after she disobeyed an order is not enough to trigger due process

---

[7] Canter claims that she was immediately assigned to disciplinary segregation while defendants claim she was assigned to administrative segregation pending adjustment prior to the disciplinary hearing.  There is no dispute that Canter was placed in protective custody on August 3, 2022.  ECF 1 at 15, ¶ 45; ECF 17-2 (Decl. of Hull), ¶ 8.

protections.  Canter's Complaint is devoid of factual allegations that would lead this court to conclude that she was subjected to harsh and atypical conditions when she was moved.

Although Canter claims that she was placed in a strip cell without her personal property and medications (ECF 1 at 11; ECF 21-1 at 8), she does not allege that she remained in that cell without her personal property.  Moreover, she does not state what medication she was denied or the consequences of that denial.  Nor is there any indication in the Complaint or the opposition that defendants were aware that Canter had not received her medication.  Rather, the Complaint is replete with Canter's descriptions of letters and complaints she filed while she was awaiting an adjustment hearing, but none concerned the conditions under which she was confined.  Instead, Canter complained that Lt. Parsons had falsified the charges against her.

In sum, Canter has not described conditions that deprived her of a basic human need.  Nor has she alleged facts that would amount to deliberate indifference, if proved.  Plaintiff's placement in segregation pending her adjustment hearing does not suffice to state an Eighth Amendment claim.

### E.    Retaliation

Canter claims that all of the adverse actions taken against her were retaliatory.  She asserts that Lt. Parsons retaliated against her when he issued the Notice of Inmate Rule Violation against her; Sgt. Hays retaliated against her by refusing to process her ARP complaints and for denying her access to forms to file the complaints; and the remaining defendants failed to intervene on her behalf after she told them about the conduct at issue.  Canter maintains that the retaliation occurred because she has been litigious and because she testified against a correctional officer in a criminal trial.

To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023); *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017); *Constantine v Rectors & Visitors of George Mason Univ.*, 411 F.3d 479, 499 (4th Cir. 2005).

In assessing a First Amendment claim of retaliation, the question, "from an objective standpoint," is "whether the challenged conduct would 'likely deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023) (quoting *Constantine*, 411 F.3d at 500). And, "the challenged conduct" must "generate more than a de minimis inconvenience. *Curtis*, 60 F.4th at 730. Moreover, the Fourth Circuit has said that "'[a]n action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate.'" *Martin v. Duffy*, 977 F. 3d 294, 306 (4th Cir. 2020) (citation omitted) (brackets in *Martin*).

Notably, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). But, "incarceration does not divest prisoners of all constitutional protections." *Id.* at 228. "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Although prisoners retain First Amendment rights, those rights are not unlimited and may be curtailed by prison officials under appropriate circumstances. *Jones v. N.C. Prisoner's Labor Union, Inc.*, 433 U.S. 119, 125 (1977) (upholding prison regulations limiting prisoner's speech regarding the operation of a prisoner union).

32

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)); *Martin,* 977 F.3d at 306 (courts view claims in this context with an eye toward avoiding "'excessive judicial involvement in prison administration.'") (quoting *Pratt v. Rowland*, 65 F.3d 803, 807) (9th Cir. 1995)).  As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation.  *White v. White*, 886 F.2d 721, 724 (4th Cir. 1989).  Moreover, a retaliation claim fails if there is a legitimate reason for the alleged retaliatory action.  *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

In evaluating a causal relationship in a retaliation claim, the plaintiff must satisfy a prima facie burden to show that her protected activity was "a substantial or motivating factor" in the defendant's action.  *Martin*, 977 F.3d at 299; *see Shaw*, 59 F.4th at 130-131.  In the posture of this case, to meet the element of causation, the plaintiff must allege 1) that the defendant was aware of the protected activity and 2) "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501.

Accepting Canter's allegations as true, the retaliation claim fails.  Canter meticulously recounts her history of civil litigation during her interactions with defendants and notified supervisory defendants of her belief that she is the target of retaliatory conduct.  But, prior civil litigation does not insulate her from all negative treatment.  This is particularly true where, as here, there has admittedly been a failure to follow an order given by a correctional officer.  *See* ECF 1 at 15, ¶ 44 ("i [sic] told the hearing officer that I was Guilty of rule violation 316 disobey a order").

To the extent that Canter was erroneously charged with conduct committed by her cellmate, that error was corrected during the adjustment hearing, when Canter was found not guilty. *Id*. at 14-15, ¶ 44. Canter's recollection that several of the defendants remarked that they did not care about her civil cases, and that she could call her attorneys to tell them about what was going on, does not amount to evidence of a retaliatory animus. *See Id*. at 9, ¶ 26; 13 at ¶ 42; 15 at ¶ 46. Statements of apathy do not amount to conduct that is likely to deter a person of ordinary firmness from the exercise of First Amendment rights. This would seem particularly true here, as there is no allegation that any of the named defendants were sued by Canter on a prior occasion.

### F. ADA Claim

Canter states that she suffers from "significant mental health issues," which include depression, bipolar disorder, and severe post traumatic stress disorder. ECF 1 at 4, ¶ 6. She asserts that defendants violated her rights under the ADA.

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id*. § 12101(b)(2). The ADA contains five titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see Richardson v. Clarke*, 52 F.4th 614, 619 (4th Cir. 2022). It prohibits public entities, including "any State or local government" and "any department, agency, special purpose

district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.

Title II of the ADA applies to "'anything a public entity does.'" *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011). Of import here, Title II applies to state prisons. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity . . .'").

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). And, it is well established that a private party may sue to enforce Title II of the ADA. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).

To state a claim under Title II of the ADA, a plaintiff must allege: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016); *see also Richardson*, 52 F.4th at 619; *Helping Hand, LLC*

*v. Baltimore County*, MD, 515 F.3d 356, 362 (4th Cir. 2008); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

The ADA defines "public entity" as "any State or local government" or any "department, agency . . . or other instrumentality of a State . . . ."  42 U.S.C. § 12131(A)-(B).  This text does not include private individuals or entities. *See Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam); *see Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471 (4th Cir. 1999); *Dorsey v. Hogan*, TDC-21-0721, 2022 WL 4467247, at 6-7 (D. Md. Sept. 26, 2022).

"Discrimination" barred by Title II includes "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with "full and equal enjoyment" of the facility's services.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide.  *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities.  *Richardson*, 52 F.4th at 619; *Constantine*, 411 F.3d at 488-89.  Rather, the public entity is obligated to make those modifications that do not

"fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade*, 480 F.3d 1072, 1082 (11th Cir. 2007); *see also Lamone*, 813 F.3d at 507-08 ("A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)); *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013).

Pursuant to regulations promulgated consistent with the ADA, a public entity must "take appropriate steps to ensure that communications" with disabled persons "are as effective as communications with others." 28 C.F.R. § 35.160(a). Furthermore, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities. . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity. 28 C.F.R. § 35.160(b)(1)")).

In her suit, plaintiff identifies the mental conditions that she believes qualify as disabilities under the ADA. ECF 1, ¶ 6. But, Canter has not alleged that she was the subject of discrimination based on that disability. Canter simply states that her mental health issues worsened when she was assigned to disciplinary segregation. Assuming she has a disability, Canter's ADA claim fails on the second and third elements of an ADA claim. She fails to allege that she was excluded from participation in services, programs, or activities for which she was otherwise qualified, and she fails to allege that exclusion was the result of discrimination based on her disability. Moreover, to the extent that plaintiff seeks to sue the individual defendants based on the ADA, they do not qualify as a public entity. Therefore, the ADA claim must be dismissed for failure to state a claim.

### G.  Access to Administrative Remedies

Plaintiff alleges that she was denied forms for filing ARP complaints and that defendant Hays admitted instructing officers on the housing unit not to give Canter any more forms.  ECF 1 at 14, ¶ 43.  At the same time, however, Canter admits she filed several ARPs while she was confined to segregation pending her adjustment hearing.  *Id*. at 13, ¶¶ 39, 41 and 42. Notwithstanding those seemingly contradictory allegations, the assertion that Canter had to resort to buying ARP forms from other inmates is liberally construed to mean that she was denied access to the administrative remedy procedure.

Canter's claim that she was denied access to forms used to file an ARP is a claim that she is denied access to courts, because the administrative exhaustion requirement is broad.[8]  The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust available administrative remedies before filing suit in federal court.  *See Younger*, 2023 WL 5438173, at *4.

Title 42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 681 (4th Cir. 2005) (PLRA exhaustion not a basis for *sua sponte*

---

[8] To the extent that the claim may be construed as a denial of access to a prison program, *i.e.*, the administrative remedy procedure, the law is well established that prisoners do not have a constitutional right to access programs "so long as the conditions of confinement do not otherwise violate the Constitution."  *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

dismissal, but upon proof of affirmative defense raised by defendants, non-exhaustion requires dismissal).  The tools required by *Bounds v. Smith*, 430 U.S. 817, 821 (1977) "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."  *Lewis v. Casey*, 518 U.S. 343, 355 (1996).  Impairment of other capacities to litigate are consequential to incarceration and are constitutional.  *Id*.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355).  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches."  *Lewis*, 518 U.S. at 349.  Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts.  *Id*. at 399.  "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope."  *Christopher v. Harbury*, 536 U.S. 403, 416 (2002).

Canter fails to allege an actual injury resulting from the denial of ARP forms.  Thus, this claim must also be dismissed.

### H.    Conspiracy Claims under 42 U.S.C. § 1985

Pursuant to 42 U.S.C. § 1985, Canter alleges that defendants Bivens, Wise, Newlin, Green and Hays conspired with Parsons to facilitate unlawful punishment and harassment by failing to take corrective measures after Parsons issued a Notice of Inmate Rule Violation containing false

allegations.  ECF 1 at 18.  Canter claims that this amounts to a conspiracy to deny her of her rights under the Eighth and Fourteenth Amendments.  *Id*.

Section 1985 of 42 U.S.C. is a civil rights statute.  It specifies what constitutes a conspiracy to violate constitutional rights.  It is designed to protect citizens in the following instances:

(1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent

by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

In *A Society Without A Name v. Virginia*, 655 F.3d 342 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012), the Fourth Circuit considered, among other things, the adequacy of a claim under 42 U.S.C. § 1985(3). It said, *id.* at 346: "[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy. . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" (quoting *Twombly*, 550 U.S. at 556-57) (ellipses in *A Society Without A Name*).[9] The Court added that "factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement." *A Society Without A Name*, 655 F.3d at 346.

Thus, to state a claim under 42 U.S.C. § 1985(3), "Depriving persons of rights or privileges," a plaintiff must set forth the following, *id.*:

(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

---

[9] Two judges dissented from other portions of the opinion.

*See also Simmons v. Poe*, 47 F.3d 1370, 1376–77 (4th Cir. 1995); *Buschi v. Kirven,* 775 F.2d 1240, 1257 (4th Cir. 1985).

A plaintiff asserting a claim of conspiracy has a "'weighty burden.'" *Barret v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 434 (4th Cir. 2020) (citation omitted). The plaintiff "must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights." *Simmons*, 47 F.3d at 1377 (internal quotation marks omitted). To plead a claim of civil conspiracy, the plaintiff must also allege facts that, if proven, show that defendants acted jointly and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). And, of import here, the *Simmons* Court said, 47 F.3d at 1327: "[W]e have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."

An essential element for a claim of conspiracy to deprive a plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 655 F.3d 342, 346 (4th Cir. 1987). Without an agreement, the independent or parallel conduct of two or more wrongdoers does not amount to a conspiracy. *See A Society Without A Name*, 639 F.2d at 1075-76. And, without a deprivation of a constitutional right, a conspiracy claim is not stated. *Massey v. Ojaniit*, 759 F.3d 343, 357-8 (4th Cir. 2014); *see also Glassman v. Arlington Co., Va.*, 628 F.3d 140, 150 (4th Cir. 2010).

"To avoid interpreting Section 1985(3) as a general federal tort law, the Supreme Court has emphasized that, as under Section 1981, the plaintiff must prove as an element of the cause of action 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' The plaintiff has presented absolutely no evidence that defendants were

motivated by a race-based animus." *Dennis v. Thurman*, 959 F. Supp. 1253, 1263 (C.D. Cal. 1997) (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

There are no allegations of an agreement between defendants to deprive Canter of her constitutional rights.  This claim must also be dismissed.

### H.    Pendent State Law Claims

Canter asserts a negligence claim against the State of Maryland.  ECF 1 at 19.  To the extent that Canter raises claims of negligence as well as State constitutional violations against the State and the individual defendants, I will dismiss those claims, without prejudice to plaintiff's rights to pursue the claims in State court.

Under 28 U.S.C. § 1367(a), a district court is authorized to resolve state law claims under the grant of supplemental jurisdiction.  Pursuant to § 1367(c)(3), however, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

In *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), the Fourth Circuit recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished."  *See also ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012) ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Northwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28

U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"). *See*, *e.g.*, *Ramsay v. Sawyer Property Management of Maryland, LLC,* 948 F.Supp.2d 525, 537 (D. Md. 2013) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after dismissing FDCPA claims); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F.Supp.2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims."). In my view, the claims implicate questions of State law, which the State courts are well equipped to address.

When exercising this discretion, the Supreme Court has instructed federal courts to "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Court has also said: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

In the absence of a viable claim that comes within federal question jurisdiction, I decline to exercise supplemental jurisdiction over the remaining State law claims.

## V.    Conclusion

For the reasons stated herein, defendants' Motion, construed as a motion to dismiss, shall be granted and the Complaint shall be dismissed. To the extent raised, all State law claims of negligence and State constitutional violations are dismissed, without prejudice.

A separate Order follows.

_____/s/_____

Date:  September 6, 2023                    Ellen L. Hollander
United States District Judge